NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0086n.06

No. 23-5324

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 12, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| KHALID ASHANTI RAHEEM, II, | ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: SILER, CLAY, and READLER, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Raheem appeals the district court's judgment and sentence on account of its application of sentencing enhancements § 3C1.1 for obstruction of justice and § 2K2.1(b)(4) for a stolen firearm, as well as the district court's denial of his motion for a reduced sentence pursuant to 18 U.S.C. § 3582(c)(2). For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Factual and Procedural History

In December 2019, the FBI launched an investigation of several individuals suspected of drug and gun-related crimes, including Defendant Raheem. The results of the investigation led a grand jury to charge Defendant with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841, and 851 (Count 1), distribution of controlled substances in violation of

21 U.S.C. §§ 841 and 851(Counts 12 and 13), and possession of guns by a felon in violation of 21 U.S.C. §§ 922 and 924 (Count 20).

### i.     *Remmer* Hearing

At Defendant's trial, the court became aware of some alleged unintended contact between jurors and non-jurors at the courthouse. Citing the need to remain fair and impartial, the court announced its intent to hold a *Remmer* hearing to investigate the matter and "voir dire the individual members of the jury." Jury Trial Tr., R. 618, at Page ID #4417; *Remmer v. United States*, 347 U.S. 227 (1954). The court proceeded to clear the courtroom and question the jurors individually for almost two hours, while also permitting defense counsel to ask follow-up questions after each set of questions. During this time, the jurors answered questions about their interactions with each other, the parties to the case, and the parties' family members, in addition to whether any encounter had affected their abilities to remain impartial. While some jurors admitted to being fearful or having safety concerns, they nonetheless assured the court that they could remain fair and impartial.

On account of these safety concerns, defense counsel moved the court to discharge the panel and declare a mistrial. The court denied the motion, explaining that the jurors were asked "a sufficient number of questions for them to feel free to answer that they didn't think that they could be fair or impartial," and that the jurors seemed sincere. *Id*. at Page ID #4498-99. Further, the court discussed various ways in which the jurors' safety concerns could be addressed, such as by holding all parties in the courtroom until the jurors made it to their vehicles. Despite these safety concerns, the court felt that the jurors were truthful because, after closely observing each juror, "none of them had wavering voices, none of them really hedged with the exception of one juror." *Id*. at 4499. The court dismissed the one questionable juror for repeatedly hedging his

answers, which did not inspire the court's confidence that he would remain fair and impartial. All other jurors were deemed fit.

### ii. Trial Testimony

Throughout the trial, various witnesses testified against Defendant. One witness, Joseph Allgeier, confessed to being the owner of a Taurus 709 Slim gun that he purchased for $220 in 2017. Allgeier gave the gun to Defendant "as collateral" in exchange for receiving $80 worth of heroin, with the understanding that Defendant would return the gun after being paid for the drugs. Trial Tr., R. 615, at Page ID #3992–93. However, when Allgeier later attempted to pay Defendant and retrieve his gun, he heard that "[Defendant] said he used [the gun] and tossed it." *Id*. at 3992–93. Although Allgeier reported the gun as stolen, testimony indicated that the report never entered the system.

Another witness, Megan Lee, was compelled to testify pursuant to subpoena. Lee, admittedly a drug addict, discussed her own involvement in drug buys between her cousin, Jason Logsdon, and his drug dealer, and how she benefited from these deals. Some of Lee's trial testimony conflicted with her earlier statements, such as when she denied having purchased drugs from somebody named "O," despite previously telling the government that she had. Logsdon, Lee's cousin, also testified to purchasing heroin with Lee. At the close of evidence, the jury found Raheem guilty on all counts.

### iii. Sentencing Hearing

The probation office prepared a presentence report that contained two sentencing enhancements: one for obstruction of justice and the other for the stolen gun. Defendant Raheem objected to both. In addressing Defendant's objections, the court noted that it was "not restricted

to information that would be admissible at trial" so long as it was "sufficiently reliable." Mem. of Conference and Order, R. 530, Page ID #3173.

At sentencing, FBI Special Agent Zachary Harrison testified with respect to the first enhancement for obstruction of justice. Harrison stated that he "assist[ed] with transporting witnesses and sitting in for meetings with witnesses," and that he was present for a meeting with Megan Lee at the United States Attorney's Office on October 18, 2022. Sentencing Tr., R. 578, at Page ID #3407. Specifically, he said that Lee mentioned that "O" was working for Defendant. Then, on October 24, 2022, Lee told Harrison that she knew "O" and Defendant were connected because "she had developed a relationship with 'O' that had been more than a typical drug dealer to drug user relationship." *Id*. at Page ID #3408. Lee said that "O" confided in her and "let her sit on a Facetime call between himself and [Defendant]." *Id*.

Lee told Harrison that during this call, "'O' had confided in [her] that [Defendant] was trying to figure out if Jason Logsdon was still buying drugs." *Id*. at Page ID #3409. Harrison testified that Lee was told "that this was retribution and that basically [Defendant] was trying to find out if Logsdon was still purchasing drugs so [Defendant] could overdose [Logsdon] and get rid of him, basically." *Id*. Harrison also noted that the slang term for such an overdose is a "hotshot." *Id*. Furthermore, Harrison testified that he had located "O" through a series of record searches and identified him as O'Marion Bullock. *Id*. After seeing a picture of Bullock, Megan Lee was able to confirm that Bullock and "O" were the same person. Harrison testified that after Lee learned of Defendant's intent to "hotshot" Logsdon, she grew less cooperative and more emotionally shaken, and told him, "I'm not getting killed for this." *See id*. at Page ID #3417–18.

The court ultimately found Lee credible because she "did not appear to be untruthful so much as not disclosing things out of fear," and that "the most powerful evidence [was] her

demeanor." Mem. of Conference and Order, R. 530, at Page ID #3182; Sentencing Tr., R. 578, at Page ID #3435. The court also found Agent Harrison's testimony credible, with a "sufficient indicia of reliability." Mem. of Conference and Order, R. 530, at Page ID #3182. In consideration of all the facts and circumstances, the court applied the obstruction-of-justice enhancement.

With respect to the stolen gun enhancement, Defendant argued that the gun was not stolen because Allgeier "essentially traded it or bartered it for drugs when he didn't have money." Sentencing Tr., R. 578, at Page ID #3451. After reviewing Allgeier's testimony, the court remarked that it was "pretty clear that [Allgeier] was denied access to a firearm that he had given to [Defendant] for safekeeping, brought the money back, went to get the firearm." *Id*. at Page ID #3459. Therefore, the court applied the stolen gun enhancement, and Defendant was sentenced to a term of 132 months imprisonment, followed by four years of supervised release. This appeal followed.

## II. DISCUSSION

### A. Application of Sentencing Enhancements § 3C1.1 and § 2K2.1(b)(4)

This Court reviews *de novo* a district court's legal interpretation of the Sentencing Guidelines, while reviewing a district court's factual conclusions for clear error. *United States v. Flores*, 974 F.3d 763, 765 (6th Cir. 2020). The government must prove by a preponderance of the evidence that a sentencing enhancement applies. *See United States v. Iossifov*, 45 F.th 899, 923 (6th Cir. 2022).

### i. Obstruction of Justice Enhancement

Defendant argues that the government did not prove its case by a preponderance of the evidence because of various problems concerning Megan Lee's statements to Agent Harrison. Defendant contends that Lee was not a credible witness due to her dishonesty and history of drug

use, and that her statements about the FaceTime call, as relayed through Agent Harrison's testimony at sentencing, contained multiple levels of hearsay. He also argues that Logsdon's testimony at trial did not indicate that Logsdon had any knowledge of the threat made against him. Further, Defendant appears to suggest that his desire for retribution against Logsdon would not constitute an attempt to obstruct justice. In response, the government argues that the evidence denoted Defendant's attempt to intimidate or otherwise unlawfully influence Logsdon, and possibly Lee, to perjure themselves at trial. The government also refers to the court's reasoned credibility determinations in evaluating the testimony of Agent Harrison and Megan Lee, in arguing that the two-level enhancement was proper. We agree with the government.

Under Sentencing Guidelines § 3C1.1, a defendant's offense level should be increased by two levels where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing," assuming the obstructive conduct was related to the offense. *Iossifov*, 45 F.4th at 923 (quoting U.S.S.G. § 3C1.1). In this Circuit, one example of obstructive conduct is when a defendant's behavior "can be reasonably construed as a threat." *United States v. Robinson*, 813 F.3d 251, 263 (6th Cir. 2016) (quoting *United States v. Kamper*, 748 F.3d 728, 744 (6th Cir. 2014); *see also United States v. Parsons*, 798 F. App'x 922, 927 (6th Cir. 2020) (noting that "[t]hreats alone are enough to justify the enhancement."). This includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. 4(A). Notably, the enhancement also applies to indirect threats that are communicated through a third party or other intermediary, "even where the witness may never learn of the threat." *United States v. Fisher*, 824 F. App'x 347, 358 (6th Cir. 2020) (citing *United States v. Talley*, 443 F. App'x 968, 972–73 (6th Cir. 2011)); *see also United States v. French*, 976

F.3d 744, 749 (6th Cir. 2020) (holding that an obstruction-of-justice enhancement was warranted when a defendant's Facebook posts "acted as a threat to those who might assist law enforcement.")).

In the present matter, Agent Harrison recounted a conversation that Megan Lee overheard between "O," her drug dealer, and Defendant Raheem, during a FaceTime call. Specifically, Harrison testified that Lee heard Raheem ask "O" whether Logsdon was still buying drugs. Raheem proceeded to tell "O" that he wanted to "get rid" of Logsdon by causing him to overdose on drugs (in the form of a "hot shot"), presumably as retribution for Logsdon's cooperation with the prosecution. *See* Sentencing Tr., R. 578, Page ID #3409. Because of Harrison's testimony, the court imposed a two-level sentencing enhancement for obstruction of justice.

To the extent that Defendant challenges the admissibility of this evidence, his arguments must fail because this Court does not reweigh evidence or review the district court's witness credibility determinations. *United States v. Bailey*, 444 U.S. 394, 414–15 (1980) (observing that "[i]t is for [the jury], generally, and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story.")); *see also United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994) (noting that, "[t]he credibility of witnesses is exclusively the province of the jury.")); *United States v. Bates*, 78 F.3d 585 (6th Cir. 1996) (table case) (deferring to the district court's witness credibility determinations in affirming a sentence enhancement for obstruction-of-justice)).

In the present case, the district court evaluated the testimony of Agent Harrison and Megan Lee and determined that "Lee did not appear to be untruthful so much as not disclosing things out of fear." Mem. of Conference and Order, R. 530, at Page ID #3181–82. The court drew this conclusion largely from "sitting [in the courtroom] listening to [Lee], watching [Lee]," Sentencing

Tr., R. 578, at Page ID #3434, and the fact that Lee described a specific instance "where she is purchasing [drugs] from an individual and Facetiming with Mr. Raheem, not some other person." *See id*. at Page ID #3435. The court also found Agent Harrison's testimony to be credible, based on "the FBI agent's credibility and Lee's credibility at trial." Mem. of Conference and Order, R. 530, at Page ID #3181-82. Ultimately, the court concluded "that the testimony and evidence had the appropriate indicia of reliability and fulfilled the elements of § 3C1.1 by a preponderance of the evidence." *Id*. Because the district court "was in a unique position to evaluate Lee's character, credibility, and demeanor," these credibility determinations are entitled to deference. *Id*.

Defendant also cannot attack the testimony of Harrison and Lee as hearsay evidence because the Federal Rules of Evidence do not apply at sentencing. *United States v. O'Lear*, 90 F.4th 519, 539–40 (6th Cir. 2024); *see also United States v. Zerpa-Ruiz*, 784 F. App'x 353, 356 (noting that a sentencing court is also not bound by the Confrontation Clause). Thus, sentencing courts "may consider hearsay as long as it meets a relatively modest 'reliability' bar." *O'Lear*, 90 F.4th at 539–40 (citing *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019)). In the present case, the court acknowledged that Lee's statements were indeed hearsay, but found a sufficient indicium of reliability to consider them.

Furthermore, it is irrelevant whether Logsdon knew that Defendant Raheem threatened him, because threats need not have an "actual effect" for the enhancement to apply. *Fisher*, 824 F. App'x at 358. For example, this Court held that a threat contained in a written letter constituted an obstruction of justice, even when the letter was not received by anyone. *See Talley*, 443 F. App'x at 969, 973. In *Talley*, the defendant wrote a letter to another drug dealer, in which he called a third person a "snitch" and asked the dealer to "beat him." *Id*. at 969. This Court noted certain factors in *Talley* that suggested the letter was a threat, such as the defendant's "logical, though

unlawful, interest in wanting [the third party] punished for acting as a government informant." *Id*. at 972. Moreover, "the letter called to a drug dealer's attention the identity of a government informant." *Id*. (noting that this factor "weighed in favor of finding that [the defendant] intended the letter to be a threat.").

Similarly, the conversation between drug dealer "O" and Defendant Raheem entailed a threat made to a third party, Logsdon, who seemingly never learned of the threat. Still, Defendant had a logical interest in wanting Logsdon punished since Logsdon was a testifying witness, and Defendant "wanted retribution against Logsdon." *See* Appellant Br., ECF No. 33, 28. The statement about wanting to "get rid" of Logsdon was also made to a drug dealer, "O," which this Court deemed threatening in *Talley*. *See* 443 F. App'x at 972.

Our decision in *Talley* also weighs against Defendant's supposed claim that a desire for retribution would also not be an obstruction of justice. In *Talley*, the defendant's letter to his drug dealer branded the third party as a "snitch," evincing a clear motive for wanting him beaten. 443 F. App'x at 969, 972 (noting that "the district court found that [the defendant] had motivation" for the threat, which constituted an obstruction of justice). It also bears repeating that an obstruction-of-justice enhancement is warranted whenever "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing." *Iossifov*, 45 F.4th at 923. In the present matter, Defendant's desire for "retribution" manifested as a threat to a potential witness, which undoubtably bears upon the prosecution and overall administration of the case. Accordingly, because the testimony at sentencing indicated that Defendant threatened a witness through a third party, and the court found this testimony credible, we affirm the district court's judgment on this issue.

### ii. Stolen Gun Enhancement

Defendant next argues that the stolen gun enhancement is inapplicable because Joseph Allgeier willingly gave him a gun in exchange for drugs, and therefore the gun was not stolen. He also states that "a refusal to conduct a return transaction does not make the gun stolen" within the meaning of *United States v. Jackson*, because there was no dishonesty or secrecy involved. *See* Appellant Br., ECF No. 33, 34 (citing 401 F.3d 747, 750 (6th Cir. 2005)). The government responds that *Jackson* deems a gun stolen "when it is taken or possessed without the owner's consent," which occurred in the present case when Defendant lied about the whereabouts of Allgeier's gun and proceeded to keep it in his safe. *See* Appellee Br., ECF No. 36, 22. We agree that the gun was stolen.

In *Jackson*, we held that "steal" means "[t]o take dishonestly or secretly." 401 F.3d at 750. This includes fraudulent purchases, or cases "where consent was fraudulently induced." *See United States v. Brown*, 86 F.4th 1164, 1167 (6th Cir. 2023). In addition, "a § 2K2.1(b)(4) enhancement may be properly considered even absent evidence that the defendant knew the [] gun was stolen." *United States v. Webb*, 403 F.3d 373, 384 (6th Cir. 2005); *see also United States v. Rolack*, 362 F. App'x 460, 462 (6th Cir. 2010) (mentioning that "[t]he Commentary to the Guideline [regarding § 2K2.1(b)(4)] renders irrelevant the defendant's lack of knowledge that the firearm was stolen.")).

In the present case, the evidence shows that Allgeier gave the gun to Defendant merely as collateral to purchase the drugs, and that he proceeded with the understanding, however misguided, that Defendant would return the gun. This is reflected in Allgeier's testimony that "[Defendant] said today to give him collateral [for the drugs] and [the gun] was what I used as collateral." Trial Tr., R. 615, at Page ID #3992. The price of the gun further supports Allgeier's assertion that it was

given as collateral for the drugs, since Allgeier paid $220 for the gun, which was more than double the value of the heroin received. Allgeier also went to the trouble of reporting the gun stolen, which strongly suggests that he did not anticipate Defendant keeping the gun, and rather, was fraudulently induced to surrender it. *See Brown*, 86 F.4th at 1167. Consistent with *Jackson*, Defendant also lied about the gun's whereabouts while continuing to possess it, which was unambiguously dishonest. *Jackson*, 401 F.3d at 750. The fact that Defendant did not explicitly lie to Allgeier during their initial trade should not change the conclusion that he acquired the gun fraudulently, under false pretenses, and subsequently lied to maintain control of it. Furthermore, this Court has held that a defendant need not know that a gun is stolen. *Webb*, 403 F.3d at 384. We therefore affirm the district court's application of the stolen-gun enhancement.

### B. Defendant's Motion for Mistrial

We review a district court's decisions regarding alleged juror misconduct for an abuse of discretion, including the issue of whether to grant a mistrial. *See United States v. Orlando*, 281 F.3d 586, 593 (6th Cir. 2002). In showing juror bias, *Smith v. Phillips* has shifted the burden from the government to the defendant. *See United States v. Zelinka*, 862 F.2d 92, 95 (6th Cir. 1988); *see* 455 U.S. 209 (1982).

Defendant argues that he is entitled to a mistrial because certain jurors admitted to feeling fearful or unsafe, signifying that the jury was not impartial. The government responds that the district court conducted a proper *Remmer* hearing by thoroughly questioning all jurors and did not abuse its discretion by concluding that they could fulfill their duties and remain unbiased. *Remmer v. United States*, 347 U.S. 227 (1954). Once again, we agree with the government.

The Supreme Court has "long held that the remedy for allegations of juror partiality is a [*Remmer*] hearing in which the defendant has the opportunity to prove actual bias." *United States*

*v. Davis*, 407 F. App'x 32, 36 (6th Cir. 2011) (quoting *Smith*, 455 U.S. at 215)). Prejudice is never assumed, even if the jurors have been "placed in a potentially compromising situation." *See Smith*, 455 U.S. at 217. Rather, this Court gives "great weight" to jurors' assurances that they can remain impartial. *See United States v. Gills*, 702 F. App'x 367, 380 (6th Cir. 2017). A defendant may rebut these assurances with circumstantial evidence of juror partiality. *Id*. at 379 (citing *United States v. Pennell*, 737 F.2d 521, 532–34 (6th Cir. 1984)).

At the *Remmer* hearing in the present case, the jurors repeatedly assured the court that they could remain fair and impartial, notwithstanding any safety concerns. The court therefore properly denied Defendant's motion for a mistrial, explaining that the jurors seemed sincere, and that they were asked "a sufficient number of questions" to feel comfortable admitting whether they thought they could be fair or impartial. Jury Trial Tr., R. 618, at Page ID #4498–99. None of the jurors, with the exception of one, caused the court to seriously question the jurors' ability to "set [fear] aside and listen to the evidence and be a fair and impartial juror." *Id*. The one questionable juror was dismissed. *Id*.

Considering these facts, we do not believe that the court abused its discretion in refusing to grant a mistrial. On the contrary, the court did exactly what *Remmer* requires by examining the jurors individually to "assess their demeanor[s]," and ultimately found them credible, apart from the one juror who was dismissed. *Gills*, 702 F. App'x at 380. Such a determination is afforded "great weight." *Id*. Moreover, at almost two hours in length, the court's questioning was reasonably thorough. *See United States v. Davis*, 407 F. App'x 32, 37 (6th Cir. 2011).

Defendant argues that the situation demanded a mistrial because jurors were "frightened of [him] and had likely prejudged his guilt," and that the "severity of the charges" had an "obvious impact on the jurors' ability to remain impartial, despite any assurances to the contrary." Appellant

Br., ECF No. 33, 44.  But Defendant has failed to rebut the jurors' assurances in any meaningful way, and reversing the district court's judgment would require us to simply disregard those assurances, and that is something we may not do.  *See Hughes v. United States*, 258 F.3d 453, 459–60 (6th Cir. 2001) (noting that "[a] district court may rely upon juror assurances of impartiality in deciding whether a defendant has satisfied his burden of proving actual prejudice.")).

As a final matter, a juror's admission of fear or anxiety does not necessitate their dismissal from the jury.  *Gills*, 702 F. App'x at 380 (clarifying that whenever jurors say that they are "frightened but can remain impartial, a district court can allow [them] to remain on the jury, and need not question [them] further."); *see United States v. Zelinka*, 862 F.2d 92, 93 (6th Cir. 1988).  Thus, the relevant inquiry is juror impartiality, not fear, and we hold that the district court properly relied on jurors' assurances that they could remain fair and impartial.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.